18065

Samuel WARREN, as Administrator of the Estate of Ernestine Warren, Respondent, v. WATKINS MOTOR LINES and Roy N. Hoffler, Appellants.

(130 S. E. (2d) 896)

332.

*Messrs. Moore & Mouzon,* of Charleston, *for Ap-*
*pellants*

*Messrs. J. D. Parler and Thomas O. Berry, Jr.,* of St. George, *for Respondent,*

May 1, 1963.

Moss, Justice.

This action was brought by Samuel Warren, as Administrator of the estate of Ernestine Warren, the respondent herein, against Watkins Motor Lines and Roy N. Hoffler, appellants herein, to recover damages for the wrongful death of Ernestine Warren. The action was brought pursuant to Section 10-1951 et seq., 1952 Code of Laws of South Carolina, for the benefit of the grandparents of the intestate.

Respondent's intestate came to her death at about 8:30 P. M. on September 16, 1961, at the intersection of U. S. Highway 15 and State Highway 178, at Rosinville, South Carolina, as a result of a collision between a tractor and trailer loaded with frozen food and driven by Roy N. Hoffler, an agent and servant of Watkins Motor Lines, and being operated in a southerly direction on U. S. Highway 15, and an automobile driven by Clarence Warren in which she and others were riding, traveling easterly on State Highway 178. The aforesaid highways intersect at right angles and are straight and practically level.

The complaint alleged that the death of respondents' intestate was proximately caused by the negligence, carelessness, willfulness, wantonness, recklessness and unlawful acts of the appellants in the operation of the tractor and trailer in approaching the intersection of two heavily traveled

highways at a high and dangerous rate of speed, exceeding that which was lawful, reasonable and proper under the circumstances; in failing to keep a proper lookout for other vehicles using the intersection; in failing to have the tractor and trailer under proper control; in failing to stop or turn aside the tractor and trailer in order to avoid colliding with the automobile in which respondent's intestate was riding; and in failing to yield the right of way to the automobile which had entered and was proceeding through the intersection.

The appellants, by answer, interposed a general denial and alleged that the death of the respondent's intestate was due to and caused by the negligence of the driver of the automobile in which she was riding and was not due to any negligence on their part.

This case came on for trial before the Honorable Steve C. Griffith, and a jury, on April 16, 1962, and resulted in a verdict in favor of the respondent for actual damages.

At appropriate stages of the trial the appellants made motions for a nonsuit and directed verdict in their favor and, after the verdict, for judgment *non obstante veredicto* and in the alternative for a new trial. These motions were refused by the Trial Judge and this appeal followed.

The exceptions of the appellants present two questions for determination, namely: (1) Was the death of respondent's intestate due to the negligence of the driver of the automobile in which she was riding; and (2) Was there any evidence of actionable negligence on the part of the appellants which was a contributing proximate cause of the death of respondent's intestate.

It is a well established rule of law in passing upon the exceptions of the appellants to the refusal of the Trial Judge to grant their motions for a nonsuit, directed verdict, judgment *non obstante veredicto* and alternatively for a new trial, it is incumbent upon this Court to view the evidence and the inferences fairly deducible there-

from in the light most favorable to respondent. If more than one reasonable inference can be drawn from the evidence the case must be submitted to the jury. However, if the evidence is susceptible of only one reasonable inference the question is no longer one for the jury but one of law for the Court. *Crocker v. Weathers,* 240 S. C. 412, 126 S. E. (2d) 335.

Highway Patrolman H. B. Richburg went to the scene of the collision shortly after it happened. He testified that for southbound traffic on U. S. Highway 15 approaching the intersection where the collision occurred there are the following road signs, in the order named: (1) A warning sign with a crossroad diagram with a yellow blinking light on top; (2) A crossbuck sign; (3) A sign that says "Rosinville"; (4) More black and white signs; (5) A thirty-five mile speed limit sign approximately four or five hundred feet from the intersection; (6) Another black and white sign; (7) A sign indicating junction with Highway 178; (8) A sign indicating cross roads; and (9) A direction and distance sign.

Traffic on Highway 178 is required to stop before entering its intersection with U. S. Highway 15, and for traffic eastbound on Highway 178, in approaching the intersection, there are the following signs, in the order named: (1) A "stop ahead" sign with a yellow blinker; (2) A sign bearing the name "Rosinville"; (3) A black and white sign; (4) A sign indicating junction with U. S. Highway 15; (5) A black and white cross sign; and (6) A stop sign with a blinking red light. This witness testified that he found skid marks originating north of the intersection and continuing for a distance of 117 feet to the point of impact. The first 17 feet of the skid marks were very light and the last 100 feet very heavy. The skid marks started on the right hand side of the center of U. S. Highway 15 and then veered over and went across the center line down to the point of collision, which was two feet and four inches across the center line. This witness also testified that he had a conversation with Roy N. Hoffler, the driver of the tractor

and trailer, and was told by him that as he drove down U. S. Highway 15, approaching its intersection with Highway 178, he slowed down for the caution light and was traveling about 35 miles an hour, when he observed a vehicle from his right and it appeared that it would not stop. He then swerved hard to the left to avoid a collision. This officer also testified that when the tractor and trailer came to rest, the rear end of the van was approximately 81 feet from the point of collision. An examination of the tractor and trailer showed damage on the front and side thereof. The Studebaker automobile in which respondent's intestate was riding was damaged in the front and on the left side.

Dr. William P. Wamer testified that he went to the scene of the collision on the night it happened and made a number of photographs. These were introduced as exhibits. This witness described the skid marks that he observed on U. S. Highway 15 north of the intersection. He stated that they started on the right side of U. S. Highway 15 and turned across the center line to the left side thereof.

Lenelle Summers testified that on the night of September 16, 1961, she was riding in the Studebaker automobile driven by Clarence Warren and in which respondent's intestate was riding. This witness testified that she was sitting on the left in the back seat and when the car arrived at the intersection of U. S. Highway 15 and Highway 178, Clarence Warren stopped the car just before he got to the "stop sign" and he looked both ways before proceeding across the intersection. This witness testified that she looked to the north, which was in the direction from which the tractor and trailer came, and saw a dim light about 500 feet from the intersection. She further testified that the Studebaker automobile in which she was riding had crossed the center line of U. S. Highway 15 and the tractor and trailer "come up squealing the brakes and ran into us". She estimated that the tractor and trailer, at the time, was traveling at a speed of 50 to 60 miles per hour. She testified also that she did not tell Clarence Warren that the tractor and trailer

was coming because she thought that he would be across U. S. Highway 15 before it got there and that he would have been if the tractor and trailer had stayed on its right side of the road.

Minnie Lee Dantzler testified that she was riding in the Studebaker automobile, sitting on the right in the back seat, and that when Clarence Warren approached the intersection of U. S. Highway 15 and Highway 178 he slowed down and stopped just before he got to the stop sign and "looked both ways and then started to cross". She testified that she looked both ways and saw a dim light coming down the road and it "seemed like to me it could have been a car stopped". She also testified that Clarence Warren got across the right hand portion of U. S. Highway 15. This witness also testified that the car in which she was riding had crossed over the center line of U. S. Highway 15 before it was struck and that the tractor and trailer did not continue down the road on its right side but crossed over the left of the center line and struck the Studebaker automobile.

Margaret Holmes testified that she was also a passenger in the automobile driven by Clarence Warren and was sitting on the right in the front seat, and that as he approached the aforesaid intersection, "he slowed up and come to a stop, stopped at the stop sign". She testified that she looked to the right and saw no approaching vehicles. She also testified that the car in which she was riding got across the center line of the intersection before it was struck by the tractor and trailer.

The record shows that Clarence Warren, the driver of the Studebaker automobile, and his wife, were unavailable as witnesses because they lost their lives in this collision.

Roy N. Hoffler, the driver of the tractor and trailer here involved, testified that he was familiar with the intersection of U. S. Highway 15 and Highway 178 and that the crossing was usually well marked. He said that as he approached the crossing and saw the signs that he took his foot off the

throttle, slowed the truck down, shifted into the high side of the fourth gear and approached the intersection at 35 miles per hour. He testified that the lights on the tractor and trailer were burning and that he had two head lights, five cab lights, four front corner lights, and side lights on the trailer. He said that as he approached the crossing at a speed of 35 miles per hour, he noticed an automobile coming into the crossing from his right on Highway 178 headed east. He testified that the automobile was going fast and he anticipated that it would stop before entering the intersection but as the witness approached the intersection he realized the car was not going to stop and he moved to the left to avoid hitting the Studebaker automobile. He said the Studebaker car came on across the intersection and collided with the right front steering wheel or front axle of the tractor. He said that he was turning to the left and braking the tractor and trailer simultaneously. This witness testified that he saw the yellow blinker light and had reduced his speed to .35 miles per hour before he got to the intersection signs. He estimated his speed at the time of the collision as being 15 miles per hour.

Cecil Marchant, a Deputy Sheriff of Dorchester County, testified that he assisted Patrolman Richburg in making an investigation at the scene of the collision. In the course of such, he testified he talked to Margaret Holmes and Minnie Lee Dantzler, both of whom were witnesses for the respondent in this case. He testified that Margaret Holmes said that they tried to get Clarence Warren to let his wife drive the Studebaker. He testified that Minnie Lee Dantzler, said, with reference to Clarence Warren, that "we begged him to stop, we begged him to stop but he would not stop and run right on out." Minnie Lee Dantzler testified that she did not remember telling Clarence Warren to stop.

It is the position of the appellants that the only reasonable inference to be drawn from the testimony is that the death of respondent's intestate was caused by the negligence and recklessness of Clarence Warren, the driver of the

car in which she was riding, it being asserted that he drove into the intersection heretofore described, in violation of Section 46-423 of the 1952 Code, and in utter disregard for the safety of himself and his passengers.

In the application of our statutes regulating traffic, the correlative rights and duties of drivers on the highway must be kept in mind. Here, it was the duty of Clarence Warren, as he approached U. S. Highway 15, the same being a through highway, to stop and yield the right of way to the tractor and trailer approaching on the through highway, if such was so close to the intersection as to constitute an immediate hazard under the provisions of Section 46-423 of the Code, which reads in part, as follows:

"The driver of a vehicle shall stop as required by this chapter at the entrance to a through highway and shall yield the right of way to other vehicles which have entered the intersection from the through highway or which are approaching so closely on such through highway as to constitute an immediate hazard, but such driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection on such through highway shall yield the right of way to the vehicle so proceeding into or across the through highway."

In the case of *Lynch v. Pee Dee Express, Inc.,* 204 S. C. 537, 30 S. E. (2d) 449, in construing a city ordinance containing similar requirements as are set forth in Section 46-423 of the Code, it was held that a driver of an automobile on the unfavored highway must not only stop, but is required to use ordinary care in looking for traffic approaching on the through highway. This Court said: "It is not sufficient to stop, for to stop and not to look would render the purpose of stopping ineffective. Having stopped, the driver must exercise reasonable care and diligence to discover whether traffic on the 'stop street' is approaching the intersection." In 2 Blashfield's Cyclopedia of Automobile Law and Practice, Perm. Ed., pages 223-225, Sec. 1037, we find it stated: "The duty is, indeed, not merely one of looking,

but one of observation, * * * he must look in such an intelligent and careful manner as to enable him to see what a person in the exercise of ordinary care and caution for the safety of himself and others could have seen, under the circumstances."

If Clarence Warren failed to stop before entering U. S. Highway No. 15, or if he stopped and failed to look for approaching traffic before entering the intersection, he was guilty of negligence. *Pruitte v. Machen, et al.*, 215 S. C. 13, 53 S. E. (2d) 866, and *Branham v. Wolfe Transportation Co.*, 170 S. C. 164, 169 S. E. 889. If he looked and saw the tractor and trailer approaching so closely as to constitute an immediate hazard, he was negligent as a matter of law in not yielding the right of way and in undertaking to cross the intersection. *Lawter, et al. v. War Emergency Co-operative Ass'n., et al.*, 213 S. C. 286, 49 S. E. (2d) 227.

However, if at the time Clarence Warren entered the through highway there was no traffic approaching thereon so near the intersection as then to constitute an immediate hazard, he would have a right to enter the highway, and it then became the duty of those approaching the intersection to yield the right of way to him. In other words, having lawfully entered the highway, he had a right to be there and to expect others to honor such right.

When a motorist on an unfavored highway approaches a through highway he must bring his car to a stop for such a time and in such a position as to be able to observe the traffic conditions on the favored highway and govern his conduct accordingly. The duty to yield the right of way does not mean that the driver on the unfavored highway must refrain from crossing the favored highway whenever another vehicle is approaching thereon regardless of how far distant. A motorist approaching a through highway which is protected by stop signs must yield the right of way to vehicles approaching so closely as to constitute an immediate hazard, the question

whether a particular vehicle constitutes such a hazard is ordinarily one for the jury. 5A Am. Jur., Automobiles and Highway Traffic, Sections 326 and 327, page 432. In *Lynch v. Pee Dee Express, Inc.*, 204 S. C. 537, 30 S. E. (2d) 449, we said: "When the driver looked for approaching traffic on Purdy Street, if no other vehicles had entered the intersection or were approaching so closely as to constitute an immediate hazard, the driver was warranted in proceeding."

In 5A Am. Jur., Automobiles and Highway Traffic, Section 327, page 433, it is said:

"Whether, under the statute or ordinance, he is required to stop or whether he is merely required to give the right of way to the driver on the arterial highway, it is his duty to look both to right and left; and if a vehicle is approaching on the main or arterial highway, it is his duty to wait until such vehicle has passed, unless a prudent person would have reasonable ground to believe that such other vehicle proceeding at a lawful speed is so far distant from the intersection that he could safely cross in advance thereof."

The travelers on both the favored and the unfavored highways must use ordinary care in keeping a proper lookout for vehicles approaching the intersection. If there is a conflict in the testimony as to whether a car on the through highway was approaching so closely as to constitute an immediate hazard or if the conclusion to be drawn therefrom is doubtful and uncertain, the Court will not decide the question as one of law and it must be submitted to the triers of the fact.

We think that under the evidence heretofore recited, when considered in the light most favorable to the respondent, presented issues of fact for jury determination, which included the question of whether respondent's intestate's death was due to the negligence of the driver of the automobile in which she was riding.

The only other question for determination is whether there was any evidence of actionable negligence on the part

of the appellants which was a contributing proximate cause of the death of respondent's intestate.

It is admitted that the statutory maximum speed limit at the intersection here involved was 35 miles per hour and notice of such was given by the erection of an appropriate sign, apparently pursuant to the provision of Section 46-367 of the Code. This statutory maximum speed limit is qualified by Section 46-361 of the Code, which provides:

"No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. In every event speed shall be so controlled as may be necessary to avoid colliding with any person, vehicle or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care."

The appellant, Hoffler, testified that he was aware that the speed limit at this intersection was 35 miles per hour and that he conformed to such. The testimony on behalf of the respondent is that the speed of the tractor and trailer was 50 or 60 miles per hour as the tractor and trailer approached the intersection. One of the witnesses for the respondent testified, with reference to the speed of the tractor and trailer, that "it was going fast or we would have had time to get across." We think that the Court properly submitted to the jury the question of whether the appellants were guilty of negligence in driving at an excessive rate of speed in violation of the posted speed limit. It was for the jury to determine whether the appellants were guilty of negligence which was either a direct or concurring proximate cause of the death of respondent's intestate.

In the case of *Geiger v. Checker Cab Co., et al.,* 229 S. C. 39, 91 S. E. (2d) 552, we said:

"* * * Nor is there merit in appellants' contention that evidence was wholly lacking from which it could reasonably

be inferred that the collision proximately resulted from negligence, if any there was, on the part of the cab driver. In approaching the intersection of Laurel street it was his duty to exercise due care notwithstanding his knowledge that traffic on Laurel was required to stop before crossing Gadsden. If approaching that intersection, he was traveling at an unlawful rate of speed, or was not keeping a proper lookout, or if the Geiger car had already entered the intersection before the cab reached it,—and the evidence for the respondent is susceptible of such inferences,—it was for the jury, not the court, to determine whether or not such negligence proximately caused the collision. The credibility of witnesses is peculiarly within the province of the jury. *Scurry v. International Paper Co.,* 227 S. C. 392, 88 S. E. (2d) 256."

There was a sharpe conflict in the testimony as to the speed of the tractor and trailer and there was an issue of fact as to the manner in which the Studebaker automobile driven by Clarence Warren approached and entered U. S. Highway 15. In considering the total evidence in this case, we think all issues were properly submitted to the jury for determination. More than one reasonable inference could be drawn from the evidence and this required the Trial Judge to submit the case to the jury.

The exceptions of the appellants are overruled and the judgment of the lower Court is affirmed.

Affirmed.

TAYLOR, C. J., and LEWIS and BRAILSFORD, JJ., concur.

BUSSEY, J., did not participate.